UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DARREL BENDER, an Individual; and )
MIDTOWN GROUP, INC., a Nevada )
Corporation, )
) Case No.: 2:11-cv-00172-GMN-RJJ
            Plaintiffs, )
    vs. ) **ORDER**
)
ROBERT OLIVIERI, an Individual; )
FLORDELIZA OLIVIERI, an Individual; )
3 IN 1 INC., a California Corporation; )
DOE DEFENDANTS 1 through 10; and )
ROE ENTITIES 1 through 10, )
)
            Defendants. )
)

## **INTRODUCTION**

Before the Court is Plaintiffs' *ex parte* Motion for Temporary Restraining Order (TRO) and Motion for Preliminary Injunction (PI) (ECF No. 2).  Notice of Plaintiffs' Complaint and Motion for TRO and PI was made via e-mail to Defendants' counsel on February 1, 2011 (ECF No. 6).  However this Court dismissed the case on February 1, 2011.  Plaintiff then petitioned the Court to reconsider its decision to dismiss for lack of jurisdiction (ECF No. 7).  The Court granted Plaintiffs' Motion to Reconsider and reinstated the case on February 11, 2011 (ECF No. 12).  There is no proof that Defendants have received a copy of the Court's Order reinstating the case.  Defendants have not filed a Response to Plaintiffs' Motion for TRO and PI, but it is unclear from the record that Defendants have been put on notice that this case is still proceeding.

 IT IS HEREBY ORDERED that Plaintiffs' *ex parte* Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 2) is DENIED.\

/ / /

# FACTS

Plaintiff Darrel Bender is the President and Registered Agent of Plaintiff Midtown Group, Inc. ("Midtown"). It is believed that Flordeliza Olivieri is the Owner and President of 3 in 1, Inc. ("3 in 1") and that she is married to Robert Olivieri. 3 in 1 operated two body shops in Las Vegas under the name of "All Pro Paint and Body". Midtown and 3 in 1 entered into various contracts in November 2010. The subject of the contracts was for Midtown to purchase All Pro Paint & Body from 3 in 1 for the purchase price of $240,000. (Amended Complaint Ex. A, Sales Agreement, ECF No. 13-2). The purchase price included purchasing 100% of the assets (including the equipment, licensing, various contracts phone numbers, websites and other items but not the real estate), the inventory at two locations and utility and lease deposits. (*Id.*). Midtown agreed to sublease the property located at 3615 Spring Mountain Road, Las Vegas, NV 89102 and 4220 East Craig Road, Las Vegas, NV 89030 from 3 in 1. (*Id.*; Complaint Ex. C & D, Subleases, ECF No. 13-4–13-5). Midtown also entered into a Supplier Agreement with 3 in 1 whereby Midtown agreed to buy all goods and related services necessary to manage and operate their business from 3 in 1. (Amended Complaint Ex. B, Supplier Agreement, ECF No. 13-3). Plaintiffs allege that there were other related contracts and arrangements and understandings, written or oral between the parties. One of these alleged arrangements was that 3 in 1 would transfer its bank accounts to Midway, but would "zero out" certain business bank accounts prior to the sale. Once the sale was complete 3 in 1 would not access the accounts any further. Plaintiffs claim to have fully paid the purchase price of $240,000.00 for the body shops as well as $23,993.66 for open tickets pursuant to an oral agreement. Also important are the master leases between the landlords, or owners of the property where the businesses are located, and 3 in 1. The master leases allegedly reflect a higher monthly rent due to the landlords

than the subleases.

Plaintiffs allege that in November and December there was over $20,000.00 in unauthorized activity in the business bank accounts and because of this the accounts are overdrawn.  3 in 1 has refused to transfer any of its license or permits to Midtown as agreed upon.  Plaintiffs also claim that 3 in 1 has failed to have the landlords approve and honor the subleases and that 3 in 1 misrepresented the fact that the monthly rents for the subleases is less than the amount owed in the master leases.  Plaintiffs assert that they may have to relocate the business operations based on this misrepresentation and other acts of 3 in 1, including the eviction proceedings initiated by Defendants in the Nevada state courts for the premises of the two body shops.

Plaintiffs filed the instant suit alleging twelve (12) causes of action including fraud, deceptive trade practices, civil conspiracy, breach of contract, malicious prosecution and conversion.  Plaintiffs petition this Court to issue a TRO and PI that would:

- order Defendants to return and restore to Plaintiffs all of the money paid to Defendants under the contracts (or freeze such sums);
- order Defendants to return and restore all property wrongfully taken from Plaintiffs (or freeze such property);
- order all of Defendants' assets be reasonably frozen;
- enjoin Defendants from seeking to evict Plaintiffs from their place of business;
- enjoin Defendants from turning off or cancelling telephone or utility services at Plaintiffs' places of business;
- enjoin Defendants from complaining to a regulatory agency about Plaintiffs' conduct;
- order Defendants to turn over copies of the master leases (referenced in the Subleases);
- order Defendants to cease drawing on, making transfers from, or having access to the business accounts for the two body shops; and
- order Defendants to turn over to Plaintiffs any and all property to which they are entitled under the contracts or the circumstances.

# DISCUSSION

## A.   Legal Standard

Under Fed. R. Civ. P. 65(b), plaintiffs must make a showing that immediate and irreparable injury, loss or damage will result to plaintiff if the order is not issued to support their motion for a temporary restraining order.  Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order.")  The standard for obtaining *ex parte* relief under Rule 65 is very stringent. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006).  The temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm

1  increases as the probability of success decreases." *Id.*

2  The Supreme Court recently reiterated, however, that a plaintiff seeking an
3  injunction must demonstrate that irreparable harm is "*likely*," not just possible. *Winter v.*
4  *NRDC, Inc.*, 129 S. Ct. 365, 37476 (2008) (rejecting the Ninth Circuit's alternative
5  "sliding scale" test).   The Supreme Court has made clear that a movant must show both
6  "that he is *likely* to succeed on the merits [and] that he is *likely* to suffer irreparable harm
7  in the absence of preliminary relief . . . ." *Winter*, 129 S. Ct. at 374 (citing *Munaf v.*
8  *Geren,* 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell,* 480 U.S. 531,
9  542 (1987); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311–12 (1982)) (emphasis
10 added).

11 **B.     The Possibility of Irreparable Injury to Plaintiffs**

12 Plaintiffs argue that they will be immediately and irreparably harmed by
13 Defendants' actions because Defendants are taking and concealing Plaintiffs' money and
14 other property, attempting to evict them from their place of business, trying to have
15 regulatory agencies shut Plaintiffs' business down and trying to cancel phone and utility
16 services — all of which may culminate in Plaintiffs losing their business with no
17 opportunity of recovering.

18 Most, if not all, of Plaintiffs' claims of irreparable injury constitutes monetary
19 harm.  The fact that adequate compensatory damages will ultimately be available in the
20 ordinary course of litigation weighs heavily against a claim of "irreparable harm".
21 *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937,952 (1974).  "[M]onetary harm is
22 usually not enough to constitute irreparable harm." *Los Angeles Memorial Coliseum*
23 *Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980).  However, a "substantial loss of
24 business and perhaps even bankruptcy" absent a preliminary injunctive relief shows
25 "irreparable injury." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568.

Plaintiffs claim that the business could be lost if Defendants are allowed to proceed in their state eviction proceedings and turn off Plaintiffs' business utilities and report Plaintiffs to regulatory agencies. Plaintiffs do not inform the Court when the state court eviction proceedings began and how far along they are, thus the Court does not find that those proceedings pose an imminent threat to Plaintiffs' business. Furthermore the state court may decide not to evict the Plaintiffs, making this threat speculative at best. Similarly, Plaintiffs do not offer any evidence that any regulatory agencies have done anything to stop them from running their business so it is difficult to determine that this is an imminent threat as well. The Court does recognize that being unable to obtain licenses and proper utilities could impair Plaintiffs' ability to run its business. However, the threat of this alone does not warrant the broad remedies Plaintiffs petition the Court for.

Plaintiffs also seek to freeze Defendants' assets. "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Plaintiffs claim that it "appears" that Defendants are transferring and hiding assets. However Plaintiffs provide no evidence of Defendants conduct to do such, or any history of Defendants having a tendency to hide assets.

As a whole Plaintiffs have not established that the harm posed by Defendants' actions are imminent and likely irreparable to invoke the protections of such a broad TRO or PI.

**C.  Likelihood of Success on the Merits**

Plaintiffs allege facts that Defendants stole money from Plaintiffs' bank accounts. This allegation controls whether or not the Court should enjoin Defendants from accessing the account. However there are many pieces missing from this allegation. Plaintiffs allege an agreement between the parties to both have access to the accounts

until the sale, but the Sales Agreement does not mention this arrangement.  The Sales Agreement also has a self-merger clause stating that the Agreement with its attachments constitutes the entire agreement.  This is conflicting evidence of what, if any, agreement was made regarding the bank accounts.  A large part of the harm arising to Plaintiffs is Defendants' access to the bank account.  Plaintiffs have not shown that it is likely to succeed on at least some of their claims by their own conflicting evidence.

Further the evidence regarding the subleases is equally unclear.  It appears that Plaintiffs entered these subleases with Defendants without first getting approval from the landlords.  The master leases that control the conduct between the landlords and Defendants might indicate that Plaintiffs were not allowed to sublease without the landlords' prior approval.  Plaintiffs have already alleged that the master leases require higher rent payments than the subleases.  It is unclear what legal rights Plaintiffs have under the subleases without a review of the master leases.  Plaintiffs cannot show that they can likely succeed on their claims when their legal rights under the subleases might be nullified by the master leases.

**D.     Balance of Hardships Favoring the Plaintiffs**

Plaintiffs argue that the balance of hardships weigh in their favor because they face complete financial collapse, but as discussed above this is only a speculative danger.  However, Plaintiffs are asking that Defendants be denied access to bank accounts and from transferring assets and property.  Defendants would be forced to petition the Court for access to its funds to pay any amounts not included in their normal expenses, which means they would not be able to access amounts needed from unforeseen emergencies immediately.  This clearly places a heavy burden on the Defendants.

**E.     Public Interest**

Where an injunction's reach is narrow and affects only the parties with no impact

on nonparties, "the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (citing *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003). Plaintiffs' requested injunction would only affect the conduct of Defendants, and as such the Court does not find that this factor weighs in favor of granting the TRO or PI.

## CONCLUSION

Plaintiffs' request for a TRO and PI is overbroad and would do more than preserve the status quo until a hearing can be held. Also it is not clear whether Defendants are aware that this case is still open against them. While Plaintiffs did provide notice to Defendants of the Motion for a TRO and PI it is important that Defendants have an opportunity to be heard before any of their rights are taken away. Further, the Court has found that it is not likely that Plaintiffs will succeed on the merits based on its own conflicting evidence. Plaintiffs have shown a possibility of irreparable harm but have not shown that it is likely. A preliminary injunction may not be granted based on a "possibility" of irreparable harm, even if Plaintiffs demonstrate a strong likelihood of prevailing on the merits. This is because injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. at 375–76.

IT IS HEREBY ORDERED that Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order and Motion for Preliminary Injunction (ECF No. 2) is DENIED, WITHOUT PREJUDICE.

DATED this 18th day of February, 2011.

_____
Gloria M. Navarro
United States District Judge